Marcus GOODWIN, Petitioner,

v.

Harold R. SWENSON, Warden, Respondent.

No. 1079.

United States District Court
W. D. Missouri, C. D.

July 2, 1968.

Granville E. Collins, Edward H. Hunvald, Jr., Columbia, Mo., for petitioner.

Norman H. Anderson, Atty. Gen., Howard L. McFadden, Asst. Atty. Gen., Jefferson City, Mo., for respondent.

## MEMORANDUM OPINION AND ORDER

JOHN W. OLIVER, District Judge.

This state prisoner habeas corpus case presents, among other federal questions, an alleged violation of petitioner's right to the effective assistance of counsel as guaranteed by the Sixth Amendment to the Constitution of the United States. We find and determine that petitioner is entitled to appropriate relief.

### I.

The petitioner was convicted of first degree murder in the Circuit Court of Jackson County, Missouri. His death sentence and conviction were affirmed on direct appeal in State v. Goodwin, Mo.Sup.Ct. en banc 1962, 352 S.W.2d 614. The Supreme Court of Missouri noted that:

> The trial was exceedingly brief, having begun and ended on the same day. That portion of the transcript embodying the evidence consists of about thirty-five pages, thus indicating the likelihood that not more than one hour was consumed in hearing the evidence.

Neither brief nor oral argument was presented to the Supreme Court of Missouri on petitioner's behalf in connection with his direct appeal. The questions presented to that court, under Missouri practice, were limited to the assignments made by trial counsel in petitioner's motion for new trial. Petitioner's trial counsel assigned the following as one of four assignments of error:

> Because the attorney for the defendant was unable to get any cooperation from the defendant in preparing his defense, therefore, his trial was not one which accorded him of his constitutional rights.

In regard to that assignment the Supreme Court of Missouri held:

> Grounds of a motion for new trial do not prove themselves, and the fourth assignment of defendant's motion is no exception to this rule. We have then only the bare assertion of defendant's failure to cooperate with his counsel in the preparation of the case for trial, and, of course, this presents nothing for review.[1]

Shortly after the affirmance of his conviction on direct appeal, petitioner, assisted by Mortimer A. Rosecan, Esq., a member of the St. Louis Bar who had become interested in petitioner's case, filed a petition for habeas corpus in the Supreme Court of Missouri. The per curiam denial of that petition, after a hearing in that court held March 29, 1962, is reported as In re Goodwin, Mo.Sup.Ct. en banc 1962, 359 S.W. 2d 601, cert. denied 371 U.S. 915, 83 S.Ct. 262, 9 L.Ed.2d 174. The Governor of Missouri, two days before the Supreme Court of Missouri held its habeas corpus hearing, commuted petitioner's death sentence to life imprisonment.

There is still a third reported decision concerning petitioner in the Supreme Court of Missouri, Missouri v. Goodwin, Div. 2, 1965, 396 S.W.2d 548. That case affirmed the denial, without evidentiary hearing, of a postconviction motion filed by petitioner *pro se* in his committing court. In affirming that denial the Supreme Court of Missouri held that "it is not necessary upon this appeal to detail any of the facts, or for that matter to detail the claims here, they are all set forth in the former opinions and files of this court." Applying a rule of appellate procedure now abandoned (see White v. Swenson, (W.D.Mo. en banc 1966) 261 F.Supp. 42) the Supreme

Court of Missouri simply held that "all the issues he now seeks to raise were fully considered in both the former appeal and the habeas corpus proceeding and 'he is thereby precluded from litigating the questions further by means of a motion to vacate and set aside,' (State v. Thompson, Mo., 324 S.W.2d 133, 139) and, therefore, the judgment is affirmed."

In the recent case of Noble v. Swenson (W.D.Mo.1968) 285 F.Supp. 385, decided June 17, 1968, we were able to defer to findings of fact made by the Supreme Court of Missouri under the principles stated in Townsend v. Sain, 372 U.S. 293 at 318, 83 S.Ct. 745, 9 L.Ed.2d 770. We cannot do so in this case because the findings of the Supreme Court of Missouri are general rather than specific and because, in any event, the general conclusory findings of that court are not supported by any substantial evidence.

The Supreme Court of Missouri stated that "after due consideration of the evidence and the briefs, the Court finds that the Petitioner Marcus Goodwin was represented by counsel at the trial of his case in the Circuit Court of Jackson County, Missouri; that the attorney, Lee Vertis Swinton who represented Petitioner at the trial, is an able lawyer who had had previous experience in the trial of criminal cases, including the defense of persons charged with murder; and that trial counsel conducted the defense intelligently and with discrimination." [359 S.W.2d 601]. A finding that petitioner was represented by counsel of apparent general competence is not a finding that, under all the particular facts and circumstances of this particular case, petitioner was in fact rendered the effective assistance required by the Constitution.

---

[1]. None of petitioner's assignments properly preserved any question for review. Assignment 1 was held to be "too general to preserve anything for review." Assignment 2 was held to be lacking in "the specificity required under Rule 27.20 (a)." And Assignment 3 was held "also [to be] so indefinite and lacking in particularity as to warrant our ignoring it." It should be noted, of course, that the Supreme Court of Missouri, in recognition of the "extreme brevity" of the trial and "because of the severity of the punishment and the general tenor of the proceedings and trial," ruled several questions of law *sua sponte*.

The Supreme Court of Missouri's conclusory statement that "trial counsel conducted the defense intelligently and with discrimination" was obviously intended to dispose of the case as a matter of law and is not the type of factual finding to which this Court may defer.[2]

Nor was it possible for this Court "to reconstruct the findings of the state trier of fact" because the Supreme Court of Missouri's view of the facts was not made plain either by its opinions or by any other indicia. Under Townsend v. Sain, 372 U.S. 293, at 314, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), we were therefore "compelled to hold a hearing," it being agreed that petitioner had exhausted all his available state court postconviction remedies.

## II.

The transcript of the trial shows that petitioner's conviction rested upon a statement taken by two detectives of the Kansas City, Missouri, Police Department on June 25, 1959, the day petitioner was released from Kansas City General Hospital in which he had been continuously confined since May 30, 1959, and upon petitioner's oral statement made to another police officer on the day petitioner was admitted to the hospital. On direct appeal, the Supreme Court of Missouri held that "defendant may not now claim error [on the part of the trial court] in admitting the confession for the reason that * * * when offered, defendant's counsel stated that there was no objection to its introduction." (352 S.W.2d at 620).

Petitioner's June 25, 1959 statement read in part as follows:

Q. When is the next time you saw Mazie Lee?

A. I don't remember what time it was but it was sometime early Saturday morning, May 30th.

Q. Where was it you saw her that morning?

A. At her home I guess.

Q. Do you recall what happened?

A. I don't remember what happened but things came back to me when I was going to General Hospital in an ambulance after the explosion.

Q. What explosion was this?

A. The house at 3025 Montgall where I live.

Q. Now, what do you recall happened, while you were going to the hospital?

A. While I was laying down in the ambulance, the first thing I thought about was myself. I remember cutting my two wrists and laid down on the floor at 3025 Montgall, and pulled the hose off the gas heater and turned the gas on and swallowed gas about three or four hours. I hadn't died then so I took a match and lit it and tried to blow myself up.

2. In similar manner, the Supreme Court of Missouri stated generally that "Evidence which counsel did not discover and which it is claimed should have been discovered and presented to the trial jury was introduced in the record on this, the habeas corpus, hearing." The "evidence" to which reference was made was not identified. The Supreme Court of Missouri also stated generally that "Reviewing this evidence, we find that while portions thereof may have been favorable to the defendant other portions directly connected with the favorable evidence were very detrimental to the defendant. It is doubtful if that evidence would have aided the defendant." [359 S.W.2d 601–602].

Such general and conclusory statements are not the sort of "findings of fact" to which we can defer. The following language from Powell v. State of Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254, decided June 17, 1968, although used in a different context, is applicable: "Whatever else may be said of them, those are not 'findings of fact' in any recognizable, traditional sense in which that term has been used in a court of law; they are the premises of a syllogism transparently designed to bring this case within the scope of [a particular decision of the Supreme Court of the United States]." [Id., 392 U.S. at 521, 88 S.Ct. at 2148].

Q. Did an explosion occur at 3025 Montgall as the result of your lighting the match?

A. Yes—it blowed the whole wall out and blowed me out with it.[3]

Q. When did you recall or remember being at Mazie Lee's home at 1612 E. 26th St?

A. After I got to the hospital.

Q. Do you recall what happened?

A. Not exactly word for word, the first thing that came to me was that I had shot my wife, Mazie Lee.

Q. Do you recall what happened?

A. Like I told you—I don't remember what time I left my house and went to her place. I don't recall how I got there. It all seemed like a dream to me while I was at the hospital.

Q. Do you remember being at 1612 E. 26th St?

A. It all came to me after the explosion, that I had shot Mazie Lee.

Q. How did you get in the house at 1612 E. 26th St?

A. I broke the glass out of the front door or front window, and entered.

Q. Where was Mazie Lee then?

A. She was in the kitchen.

Q. Did you have the gun with you when you broke in the door?

A. Yes.

Q. What happened after you went in the kitchen where Mazie was?

A. I must have shot her.

Q. Did you also stab her?

A. Yes. [352 S.W.2d 617–618].

The hospital records (of which petitioner's trial counsel had no knowledge) show that petitioner was admitted to the hospital on May 30, 1959 suffering from (1) first and second degree burns on his face, trunk, and extremities (about 20% of petitioner's body); (2) bilateral lacerations of his wrists, with severance of tendons; and (3) mental disorder.[4]

Police Officer Linhart testified that the defendant orally admitted that he shot and stabbed Mazie. The evidence shows that Officer Linhart questioned petitioner in the emergency room of the hospital on May 30, 1959, the day petitioner was admitted to the hospital.

3. There was evidence that petitioner made a still earlier attempt at suicide. In a written statement introduced at the preliminary hearing Ruby Jean Hollister, Mazie Lee's niece, stated that she saw Goodwin in the kitchen of Mazie Lee's apartment "holding a gun to his head * * * pulling the trigger but the gun would not go off." Petitioner's counsel never interviewed this witness.

4. Petitioner's final diagnosis to be made at the time of his release required the doctors to "list diagnosis in order of their importance, principal diagnosis first." The first final diagnosis listed was "Psychosis, type undetermined." The hospital records also show that Dr. Robert H. Barnes, Director of the Psychiatric Receiving Center, was consulted by telephone on the day petitioner was received at the hospital and that Dr. Lee Hanes recommended as early as June 9, 1959, that petitioner "should be transferred to Fulton [a Missouri Mental Health institution] for a more extensive evaluation."

Dr. Hanes later wrote Drs. Pope and Welch a memorandum in which he stated: "I talked to Dr. Barnes about Mr. Goodwin and how to get him transferred to Fulton for evaluation. He talked to the police about it and feels if his burns permit it might be advisable if he is frightening personelle [sic] to send him to jail, have them contact us and push for transfer to Fulton. I'll be out of town next week so you might contact Dr. Barnes if you have difficulty."
Another note in the hospital records shows that on June 14, 1959, "Psychiatry suggests to Fulton for extensive work up." The final note on petitioner's clinical history under date of June 24, 1959, stated "Will discharge as soon as arrangements can be made to custody police—transfer Fulton." Petitioner, of course, never was transferred to Fulton for the recommended psychiatric evaluation. He was turned over to the police who immediately took from him the written statement later introduced in evidence.

That witness testified:

Dr. Pope's diagnosis at that time was that he was suffering from first and second degree burns which took about 20 per cent of his body, and at that time limited questioning was permitted.

I questioned the defendant in regards to what occurred at 3025 Montgall, also in connection with the shooting of Mazie Lee, which occurred prior, that date. At that time the defendant orally admitted to myself, in the presence of Dr. Pope and several of the attending witnesses, that he attempted to take his life after he shot Mrs. Mazie Lee. We asked about attempting to take his life, he mentioned several ways. He stated after the shooting, he returned home and upon his arrival at the apartment, cut his wrists. That being too slow, he placed his—himself on the floor next to the gas outlet, disconnecting the heater and placing it in his mouth and covering himself with a blanket and pillow. He orally admitted that he laid there a number of minutes, he didn't know how long. Then in a final attempt, lit a match, causing the explosion. Also he further stated at this time that if police officers would arrive prior to the explosions he would have made some attempt that a policeman would have to shoot him and take his life.[5] [Pp. 89–90 Tr. on Appeal].

He also testified at the close of his testimony that:

Q. [By the prosecuting attorney] Thank you. You may inquire—just a minute. In your conversation with Goodwin at the hospital, is it my understanding that your testimony is at the hospital he admitted that he did shoot and stab Mazie Lee that morning?'

A. Orally admitted it, yes, sir.

Q. Orally admitted it to you. All right. [Id. at 92].

No objection of any sort was made to that testimony. No question was raised as to the voluntariness of petitioner's oral statement. No questions were asked concerning the petitioner's admission diagnosis of "mental disorder" because counsel was uninformed about even the existence of any hospital records at the time of trial. Petitioner's trial counsel did know from his examination of the transcript of the preliminary hearing that petitioner had been confined in General Hospital almost a month and that a written statement had been obtained from petitioner on June 25, 1959, the day petitioner was released from the hospital.

Petitioner's trial counsel was not appointed until months after a warrant for first degree murder was issued on June 1, 1959. Petitioner was, however, represented by counsel as early as the preliminary hearing which was held July 10, 1959. R. B. Kirwan represented him at that proceeding. An information charging Murder, First Degree, was thereafter filed on July 13, 1959.

R. B. Kirwan withdrew as counsel for petitioner on September 1, 1959, William H. Costello was appointed to represent petitioner on September 2, 1959. The latter recalled being in the case only "a matter of a few days" before he was "released by the Court." No court record of his release was ever made.

5. Fairness to Officer Linhart requires that we state that it is doubtful whether he knew of petitioner's admission diagnosis of "mental disorder" at the time he talked with petitioner. His police report made May 30, 1959 stated that: "The reporting officer upon proceeding to General Hospital, observed the victim being treated for injuries as mentioned previously. The victim at this time was being attended by Dr. Robert Pope, who stated that Goodwin was suffering from multiple first and second degree burns covering twenty percent of his body and two two-inch lacerations on the inside of each of his wrists. The victim was on the 'DI' list being treated in the emergency room of SW4."

It is entirely possible that Dr. Pope did not tell Officer Linhart about petitioner's mental disorder. Officer Linhart, of course, knew that petitioner was "dangerously ill," because he made a record that petitioner was on the "DI" list.

Mr. Costello stated that he thought "Goodwin told me he wanted to get it over with, plead guilty, or in some manner receive a death sentence, because he did not want to live."

The court record does not show when Lee Vertis Swinton, petitioner's trial counsel, was actually appointed to succeed Mr. Costello. He estimated that it was some three weeks before November 30, 1959, the day the case was tried.[6]

After his appointment, Mr. Swinton attempted to interview his client three or four times. He testified that he received little or no cooperation from petitioner during these visits. Mr. Swinton contacted petitioner's prior counsel, Mr. Kirwan and Mr. Costello and testified that:

> Both attorneys told me that they were forced to withdraw because Goodwin would not cooperate in any way with them, and did not want to be defended, and wanted to die by execution. As a result, both the aforementioned lawyers told me they could offer me no help or suggestions.

On Wednesday, November 25, 1959, Mr. Swinton "closed his office" to spend a couple of days preparing for trial. He testified that:

> I had the transcript of the preliminary hearing. * * * I read it, I had read it before I went down to the jail that day, and when I informed the defendant if he made all of these things that was in this preliminary hearing, he could talk with me and let me understand some things so that I could go out and do a lot of investigation and come up with an adequate defense for him. Petitioner remained silent.

He did not respond and then told him "What do you expect me to do without any leads or anything? You must know something because all of this you've been talking with the police," and he said, "I never talked with any police." What would you do in my case? I made this statement to him: "If I were in your shoes, not cooperating any more with the lawyer than what you're doing, you might as well take a plea of guilty." And this was about the extent of our conversation before we went downstairs.

In an affidavit dated March 23, 1962, Mr. Swinton gave a similar account of his unsuccessful efforts to get cooperation from petitioner:

> After I was appointed, I attempted on several occasions to interview Goodwin but he would not answer my questions or give me any information concerning his case, * * *. Mr. Goodwin at all times insisted that he wanted to die, and did not want to be defended and did not want me to represent him, nor did he want me to negotiate with the States attorney who would have recommended a sentence less than death on a plea of guilty.

Petitioner's trial counsel added:

> From my observation of him, and from the experiences of his two prior appointed counsel, I could only conclude that Goodwin was insane and I set up insanity as a defense. I told Goodwin on the Friday before trial that I was going to assert this defense and he objected to it and told me he would rather die than be proved insane.

On November 25, 1959, Mr. Swinton informed the trial court that Mr. Good-

6. The transcript of the trial shows that on September 14, 1959 the case was set for trial on October 26, 1959 and was on that day continued until November 9, 1959. On that day it was again continued until November 30, 1959. It is not unlikely that Mr. Costello's withdrawal and Mr. Swinton's appointment were made at one of those trial settings. It should be noted that Leonard Hughes, listed in some of the court records as counsel "appearing for the defendant," was never appointed by any court nor did he in fact act as petitioner's counsel. He merely sat behind Mr. Swinton for "experience." He did not participate actively in the trial; he attended no conferences with the defendant, and he neither made any suggestions nor offered any advice in regard to the trial of the case.

win did not want him as his attorney. The following occurred:

MR. SWINTON: Your Honor, this morning I went up and talked to Mr. Goodwin, preparing a defense for his trial, which is scheduled for November 30, and Mr. Goodwin informed me he did not want me to be his attorney. I told him I would come down immediately to the Circuit Court and bring him down and let him state his reasons to the Court.

THE COURT: Mr. Swinton did come down this morning and reported to me that you expressed dissatisfaction with him as your attorney. Of course, this case is set on the docket for call Monday and trial next week. How many lawyers have you had?

MR. GOODWIN: I had Mr. Kirwan.

MR. MODICA [Assistant Prosecuting Attorney]: Mr. Kirwan; Mr. Costello was appointed; and then you appointed Mr. Swinton.

THE COURT: The jacket shows exactly what Mr. Modica said. Your first attorney was Mr. Richard Kirwan; then you were represented by William Costello; and now by Mr. Swinton. What is it you have to say?

MR. GOODWIN: Mr. Kirwan wanted pay and I couldn't get the money. He resigned himself, and also Mr. Costello, he refused to take the case himself, and the Court appointed Mr. Swinton.

THE COURT: I did.

MR. GOODWIN: I don't want Mr. Swinton.

THE COURT: Why don't you?

MR. GOODWIN: I want a competent lawyer.

THE COURT: You want to be tried, is that correct?

MR. GOODWIN: Yes. He wants me to "cop out."

THE COURT: Do I understand Mr. Swinton advised you you should consider a plea?

MR. GOODWIN: He asked me to "cop out."

THE COURT: Now because you and Mr. Swinton disagree upon whether you should "cop out" or not, is that the reason for your dissatisfaction with him?

MR. GOODWIN: That is right. I want another lawyer.

THE COURT: Well, you are not going to get another because this case is set for trial Monday. Mr. Swinton, you were appointed by me. You are very capable of trying the case. I am instructing you that you should make no overtures concerning a plea for this man.

You desire a jury trial, is that right?

MR. GOODWIN: I want a jury trial and another lawyer.

THE COURT: You will get a jury trial. If you can make arrangements for another lawyer to assist Mr. Swinton between now and Monday, you may. The only dissatisfaction and reason for it is that Mr. Swinton discussed with you whether you should make a plea to some charge, and you want a trial by jury. You will be accorded a trial by jury, if you want one. You are entitled to it. Mr. Swinton will represent you. If you can make arrangements for someone to help him—

MR. GOODWIN: I don't want him.

THE COURT: This is up to you.

MR. GOODWIN: I don't want him.

THE COURT: You have been up there since July; you have had a series of three lawyers; you never seem to like any of them; there is a limit, and there has been no reason that you have advanced to me as to why Mr. Swinton should not represent you. He will represent you.

Mr. Hill, This case will be called Monday morning. It will be assigned for trial Monday morning.

I am instructing you, Mr. Swinton, to prepare for trial by jury. There will be no plea taken by any judge from this man. He wants a jury trial. He will get it.

MR. SWINTON: I would like to add, Your Honor, the defendant asked me my advice. I told him if I were in his shoes I would make a plea, but it is up to him to make up his mind.

THE COURT: Certainly it is, and even though you sincerely think he should, if a man indicates he wants to be tried by jury, nobody will take a plea, and he is going to have a jury trial.

That is all.

Mr. Swinton later stated in his affidavit of March 23, 1962 that he informed the Circuit Court of petitioner's refusal to cooperate and of his own inability to prepare for trial. However, the transcript of the hearing gives no indication of this, nor does it indicate that Mr. Swinton ever advised the court that petitioner had insisted he wanted to die.

Between the hearing on Wednesday, November 25, 1959, and the trial which began on Monday, November 30, 1959, Mr. Swinton did nothing more to attempt to prepare for trial. He testified that he did not ask for a continuance because of the pressure he felt he was under from the Court to proceed without delay. At any rate, he did not attempt in any way to investigate or raise any question concerning petitioner's competency to stand trial or to prepare for and raise the separate and independent question of whether petitioner was criminally responsible for his alleged action at the time of the offense.[7]

Mr. Swinton did not talk to a single witness before trial nor, in fact, talk to anyone at any time except the petitioner and petitioner's former counsel. He did not attempt to obtain copies of the hospital records, the police records, or petitioner's written statement.

7. Apart from the factual investigation suggested on the face of the hospital reports in regard to petitioner's mental condition, an affidavit of Father Alvin Deem, a Catholic priest and pastor of St. Joseph Church, was introduced in evidence in the state habeas corpus case. He stated in part that: "About two or three days at the most before May 30, 1959, Marcus Goodwin came to my rectory at St. Joseph Church. He told me that he was going to kill his wife and himself. At this time Mr. Goodwin was bent over in his chair and had the appearance of a person who was mesmerized. He had a faraway look in his eyes. I could best describe him as seeming to be under a spell. While he was peaceful and calm and not visibly agitated or intoxicated, he seemed to be dazed—like a man in a trance. * * * My second meeting with Mr. Goodwin occurred about a week or ten days after the killing and while Mr. Goodwin was confined at the General Hospital. I was called by a nurse who informed me that Mr. Goodwin had asked me to call upon him. When I arrived at the hospital, Mr. Goodwin's feet were shackled to the bed and his wrist bandaged and his burns covered. As I approached Mr. Goodwin's bed I could see him looking at me and, when I got up to within hearing distance, the first thing that he said was: 'I want you to help me.' I asked him how he could have done what he did, particularly after he had

come in and talked with me. His only answer was: 'I don't know.' * * * From my meetings with Mr. Goodwin, it is my opinion that he has the intelligence of a five or six-year old child and at the times that I talked with him he had absolutely no comprehension of the difference between right and wrong. I had tried to point out to him that his contemplated act was wrong in the eyes of God and he did not understand that. I tried to point out to him that his contemplated act was wrong in that it would not produce the result that he wanted, that is to get back with Mazie Lee, and I could not impress that upon him. I had also tried to impress upon him that his act was wrong and it should not be done for the sake of his children and I could not impress that upon him."

Dr. Robert L. Lam, professor of clinical psychiatry at Washington University School of Medicine in St. Louis, a certified diplomate of the American Board of Neurology and Psychiatry since 1950, testified in the state habeas corpus hearing on the basis of his personal examination of petitioner, a review of the hospital records, and Father Deem's affidavit, that petitioner was not sane either at the time of the offense or at the time of petitioner's trial. He also testified that petitioner was "incapable of making [his June 25, 1959 statement] in his right mind."

There is some inconsistency in Mr. Swinton's testimony as to when he decided to rely upon an insanity defense. The possibilities suggested indicate that the decision to raise the defense of insanity could have been made (1) several days before trial, (2) the morning of the day of trial before the trial began, or (3) after the trial had begun when Mr. Swinton was given a copy of petitioner's statement of June 25, 1959. It is clear, however, that regardless of when the decision to raise the defense of insanity was actually made, there was no effort to obtain evidence to support the defense, no motion for continuance in order to secure such evidence, no motion for an examination of the defendant to determine his competency to stand trial, and no motion for an examination in regard to the defendant's responsibility at the time of the offense.

The Supreme Court of Missouri noted that "the theory of insanity as a defense was *attempted to be injected* into the case in defendant's opening statement to the jury * * *." (352 S.W.2d at 618, emphasis ours). That court clearly indicated that an insanity defense could not be raised in such a manner. It stated, however, that the defendant "received more than his due" when, in spite of the fact that there was no "probative evidence of insanity * * * the court, nevertheless (no doubt out of an abundance of caution) instructed on insanity as a defense" (352 S.W.2d at 621). In light of the readily available evidence in the hospital records of petitioner's psychotic condition it is impossible for us to accept the notion that petitioner "received more than his due as regards the fairness of his trial below" (Ibid). Nor can we find, as did the Supreme Court of Missouri in its habeas corpus proceeding, that "it is doubtful if that evidence would have aided the defendant" (359 S.W.2d at 602).

The only evidence introduced at the trial that connected petitioner with the homicide was petitioner's out of court statements, one given orally a few hours after he had been blown through the wall of a house by the explosion, and the other taken in writing by two police officers the day he was released from the hospital with a final diagnosis of psychosis. Petitioner's counsel attempted to explain his failure to object to the written statement on the ground that "I kind of discarded the confession, because he denied making any kind of confession to me that day in jail." He added that "I took [the written statement] kind of lightly, because I was going more on Goodwin."

When asked whether he did not consider it his duty "to do everything [he] could to keep from getting that confession in evidence," petitioner's trial counsel answered:

A. Yes, sir. I agree with you. I don't know whether I might have been not acting normally under the pressure I was under to try that case at that time, whether I was paying that much attention, but I do agree that if it had only been the confession then this would have been my case to win, by keeping it out.

In explaining why he had not asked for a continuance, petitioner's counsel testified:

I had been ordered to try other cases. In fact, all of us who were appointed were ordered to try other cases, and the fact that we asked for a day or two to go out and interview some witnesses or something, we suddenly discovered on the basis of the defendant talking with us was to no avail, and having gone through this, I just set there and decided to go along with the thing.

It is apparent that petitioner's trial counsel did not lack knowledge of what procedures were available to test the admissibility of out-of-court statements. He testified that:

* * * [O]n statements I have always questioned whether it was voluntary and whether they accorded the defendant his constitutional rights by telling him that any statement could be used against him, or if he

had been allowed to call a lawyer or friends, anything like that. This time I don't think I did that at all.

Petitioner's trial counsel could not explain why he did not file a motion to suppress petitioner's out-of-court statements in this particular case, as he had done in other prior cases, other than to say:

I have had a lot of thought about that case afterwards, and if I was doing it over again, I would have done a lot of things that I didn't do. I don't know, maybe the pressure itself and having to go to trial with a man who doesn't want you as his counsel may have affected my thinking in using the usual objections and things that you would do in a criminal case.[8]

The case was tried November 30, 1959. The presentation of all the evidence is contained in approximately thirty-odd pages of the trial transcript. The jury promptly returned its verdict of guilty of first degree murder and a sentence of death.

### III.

The point of beginning in all ineffective assistance of counsel cases is Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Mr. Justice Sutherland, applying the due process clause of the Fourteenth Amendment to the facts there involved, held that the defendants had been "denied the right of counsel, with the accustomed incidents of consultation and opportunity of preparation for trial" (287 U.S. at 50, 53 S.Ct. 57). That case announced the principle that defendants are constitutionally entitled to "the aid of counsel * * * from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and

preparation were vitally important * * * as much * * * as at the trial itself." (287 U.S. at 57, 53 S.Ct. at 60). Powell v. State of Alabama established that "it is not enough to assume that counsel * * * thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt and thoroughgoing investigation might disclose as to the facts" (287 U.S. at 58, 53 S.Ct. at 60).

Powell v. State of Alabama placed great reliance upon numerous state court decisions to support its ultimate holding that in a capital case "it is the duty of the court, whether requested or not, to assign counsel for [the defendant] as a necessary requisite of due process of law." More important, that case held that such "duty is not discharged by an assignment at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case." (287 U.S. at 71, 53 S.Ct. at 65).

An accused's right to effective assistance obviously is not limited to the court room. His counsel must make reasonable investigation of the facts and of the applicable law. Cases involving instances of arbitrary action on the part of a trial court that precludes investigation and consultation present only a factual variation from the cases in which counsel for any reason fails adequately to prepare for trial. Cases involving the actual conduct of the trial and the making of a reasonable choice of rational alternatives (questions not presented under the facts of this case) are infinitely more difficult to judge and additional principles come into play in such cases. See Mitchell v. United States, 104 U.S. App.D.C. 57, 259 F.2d 787, at 793 (1958).

---

8. In explaining what he meant by "the pressure," petitioner's trial counsel reiterated that "the Court had ordered that I was going to be the lawyer * * * and that the case * * * is going to trial the first thing Monday morning.

[The judge] turned to me and told me I was going to have to try the case and he didn't want any excuses. * * * This left me with not too good a feeling."

■ Fields v. Peyton, (4th Cir. 1967) 375 F.2d 624, at 628, we believe correctly notes:

As the concept of the Sixth Amendment right has broadened to encompass the provision of counsel for indigents, so too the *standards* to which appointing courts and appointed counsel must adhere have become more exacting. Courts are required to allow counsel sufficient time to inform themselves fully, to reflect maturely and to prepare thoroughly in the cases to which they are assigned, and courts can no longer tolerate perfunctory performance by appointed lawyers of the duty owed to indigent defendants. (Emphasis the court's.)

Judge Sobeloff's statement is well borne out by the history of the right of counsel in both federal and state courts as developed by the Supreme Court of the United States since Powell v. State of Alabama, supra.

Six years after Powell v. State of Alabama, now thirty years ago, the Supreme Court held in Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), that compliance with the Sixth Amendment in federal court criminal cases "is an essential jurisdictional prerequisite to a federal court's authority to deprive an accused of his life or liberty" (Id. at 467, 58 S.Ct. at 1024). That case held that the right guaranteed by the Sixth Amendment "embodies a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is presented by experienced and learned counsel" (Id. at 462–463, 58 S.Ct. at 1022). Johnson v. Zerbst quoted and relied upon the classic due process words of Mr. Justice Sutherland in Powell v. State of Alabama:

Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is un-familiar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defence, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. [304 U.S. at 463, 58 S.Ct. at 1022].

Avery v. State of Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940), illustrates that claims that a particular defendant "was denied the right of counsel, with the accustomed incidents of consultation and opportunity of preparation for trial" (Id. at 445, 60 S.Ct. at 321) can not be decided by rote. The Supreme Court first stated:

Since the Constitution nowhere specifies any period which must intervene between the required appointment of counsel and trial, the fact, standing alone, that a continuance has been denied, does not constitute a denial of the constitutional right to assistance of counsel.

It then immediately added:

But the denial of opportunity for appointed counsel to confer, to consult with the accused and to prepare his defense, could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel.

Glasser v. United States, 315 U.S. 60, at 76, 62 S.Ct. 457, at 467, 86 L.Ed. 680 (1942), established the principle that "the right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." Adams v. United States ex rel. McCann, 317 U.S. 269, at 279, 63 S.Ct. 236, 241, 87 L.Ed. 268 (1942), emphasized that "the public conscience must be satisfied that fairness

dominates the administration of justice" and that "an accused must have the means of presenting his best defense. He must have time and facilities for investigation and for the production of evidence." Hawk v. Olson, 326 U.S. 271, 66 S.Ct. 116, 90 L.Ed. 61 (1945), held that "denial of effective assistance of counsel does violate due process" (at 274, 66 S.Ct. at 118) and that the Fourteenth "Amendment is violated also when a defendant is forced by a state to trial in such a way as to deprive him of the effective assistance of counsel" (at 276, 66 S.Ct. at 119).

In Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948), it was stated:

> Prior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered. Determining whether an accused is guilty or innocent of the charges in a complex legal indictment is seldom a simple and easy task for a layman, even though acutely intelligent. (Id. at 721, 68 S.Ct. at 322).

In reliance upon Canon 15 of the American Bar Association rule (incorporated as Rule 4.15 of the Supreme Court of Missouri V.A.M.R. governing conduct of Missouri lawyers) it was stated:

> Undivided allegiance and faithful, devoted service to a client are prized traditions of the American lawyer. It is this kind of service for which the Sixth Amendment makes provision. And nowhere is this service deemed more honorable than in case of appointment to represent an accused too poor to hire a lawyer, even though the accused may be a member of an unpopular or hated group, or may be charged with an offense which is peculiarly abhorrent. (Id. at 725–726, 68 S.Ct. at 324).

■ Chandler v. Fretag, 348 U.S. 3, at 10, 75 S.Ct. 1, at 5, 99 L.Ed. 4 (1954), states that "a necessary corollary [to the right of effective assistance of counsel] is that a defendant must be given a reasonable opportunity to * * * consult with counsel; otherwise, the right to be heard by counsel would be of little worth." Obviously, an accused who is mentally incapable of consulting with counsel is denied both his right of effective assistance and his right of meaningful consultation.

In Moore v. State of Michigan, 355 U.S. 155 (1957), the Court collected in footnote 7 on page 159, 78 S.Ct. 191, on page 194, 2 L.Ed.2d 167 the "long series of decisions of this Court [in which] the principles determining the extent to which this constitutional right to counsel is secured in a state prosecution have been discussed." That case emphasized "the right to counsel is not a right confined to representation during the trial on the merits." (Id. at 160, 78 S.Ct. at 194). The factual situation presented involved a possible defense of insanity that had not been properly raised. A review of the cases collected in footnote 7 of Moore v. State of Michigan is sufficient to reflect the applicable principles developed prior to Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

Study of part II of United States v. Wade, 388 U.S. 218 at 223 to 227, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) reflects the application of "the principle of Powell v. [State of] Alabama" to various pretrial confrontations of an accused in which the presence and assistance of counsel "is necessary to preserve the defendant's basic right to a fair trial" (Id. at 227, 87 S.Ct. at 1932). Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961), White v. State of Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963), Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) are discussed and held to "no more than [re-

flect] a constitutional principle established as long ago as Powell v. [State of] Alabama" (388 U.S. at 226, 87 S.Ct. at 1932).

The key to understanding the expanding application of the Sixth Amendment is stated in that portion of United States v. Wade, as follows:

The Framers of the Bill of Rights envisaged a broader role for counsel than under the practice then prevailing in England of merely advising his client in "matters of law," and eschewing any responsibility for "matters of fact." * * * This background is reflected in the scope given by our decisions to the Sixth Amendment's guarantee to an accused of the assistance of counsel for his defense. * * * The guarantee reads: "In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel *for his defense.*" (Emphasis supplied.) The plain wording of this guarantee thus encompasses counsel's assistance whenever necessary to assure a meaningful "defence." [Id. at 224–225, 87 S.Ct. at 1930].

■ One can not be said to have had the "assistance of counsel for his defense" in a constitutional sense unless, on the facts of the particular case, such assistance can fairly be said to be "effective" (Powell v. State of Alabama, supra, 287 U.S. at 71, 53 S.Ct. 55); "competent," (Avery v. State of Alabama, supra, 308 U.S. at 446, 60 S.Ct. 321); and "able," (Reynolds v. Cochran, 365 U.S. 525, 81 S.Ct. 723, 5 L.Ed.2d 754).

■ Anders v. State of California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), defines the extent of the duty of a court appointed appellate counsel to prosecute a direct appeal. The principle that counsel must act "in the role of an active advocate in behalf of his client, as opposed to that of *amicus curiae*" (Id. at 744, 87 S.Ct. at 1400), is obviously applicable to both trial and appellate counsel. Powell v. State of Alabama held long ago that trial counsel's assistance must be more than "*pro*

*forma*" (287 U.S. at 58, 53 S.Ct. 55 at 60). In Powell v. State of Alabama, Mr. Justice Sutherland put the following case:

Let us suppose the extreme case of a prisoner charged with a capital offense, who is deaf and dumb, illiterate and feeble minded, unable to employ counsel, with the whole power of the state arrayed against him, prosecuted by counsel for the state without assignment of counsel for his defense, tried, convicted and sentenced to death.

He ruled the hypothetical case by stating that "such a result, which, if carried into execution, would be little short of judicial murder, it cannot be doubted would be a gross violation of the guarantee of due process of law; and we venture to think that no appellate court, state or federal, would hesitate so to decide." [Id. at 72, 43 S.Ct. at 65].

Fifty years prior to Powell v. State of Alabama the case of State of Missouri v. Jones, 12 Mo.App. 93, decided by a Missouri court in 1882, dealt with an even more extreme case than that put by Mr. Justice Sutherland. In that early Missouri case the defendant was convicted of murder in the first degree and sentenced to death. The error assigned on direct appeal was the trial court's refusal to sustain a motion for new trial based on the ground of trial counsel's ignorance and incompetency in his conduct of the trial. The court found "evidence of specific and gross mismanagement" of the defense by trial counsel. It refused to follow the rule applicable to civil cases that "neither the ignorance, blunders, nor misapprehensions of counsel, not occasioned by the adverse party, is a ground for vacating a judgment or decree" in a case in which "a human life is at stake." (Id. at 94). After noting that a New York court (Sharp v. Mayor, etc., 31 Barb. 578) had held in a civil case that "courts of law are not to be used by parties in effecting, through the forms of law, the ruin of a party who has employed an incompetent, negligent, or unworthy attorney." Judge Lewis, Pre-

siding Judge of the St. Louis Court of Appeals, stated:

> If such considerations can prevail, where only money or property is concerned, how much weightier should they be, in every rightly constituted mind, when a human life is in the balance. Modern civilization stands aghast at the barbarity of the ancient law which denied to a prisoner the aid of counsel "learned in the law," when on trial for his life. [Id. 12 Mo.App. at 97].

After quoting the Missouri constitutional and legislative guarantees of assistance of counsel, the court held:

> To say that these beneficient requirements were satisfied in the circumstances of the present case, by the share taken in the proceedings by a licensed attorney, would be a mockery of the purposes of the constitution and the law. It would be a most unworthy exercise of the judicial function to administer the shadow of the law, but not its substance. We consider that the prisoner here, in effect, went to his trial and his doom without counsel, such as the law would secure to every person accused of crime. [Id. at 98].

State of Missouri v. Jones anticipated Powell v. State of Alabama by a half century. It applied a principle that has been the Law of the Land since our beginning. That principle must be applied to the factual situation here presented, else we administer only "the shadow of the law, but not its substance." [9]

## IV.

The exercise of federal habeas corpus jurisdiction and the unavoidable determination of the federal constitutional questions therein have an impact on the adminstration of criminal justice in the particular States of the Union. In Mar-

tin v. Commonwealth of Virginia (4th Cir. 1966) 365 F.2d 549, at 554, for example, the court noted that "we were informed at the oral argument that pursuant to a recommendation of the Attorney General against indicting and trying on the same day, the practice is being abandoned in the courts of Virginia."

We are confident that the Supreme Court of Virginia and the federal courts sitting in Virginia were most grateful for that Attorney General's "recognition of the dangers lurking in hasty trials" (Ibid.) and of his determination that the volume of potentially difficult postconviction proceedings, both State and federal, would be reduced by the Attorney General's recommendation.

Experience in Missouri has established that prosecuting attorneys, defense counsel, and the trial courts of this State are becoming increasingly sensitive to the presence of federal constitutional questions and are accordingly changing procedures that may not presently comply with federal constitutional standards. We are confident that the Supreme Court of Missouri and this Court are grateful for the improved procedures presently being evolved at the trial court level in the State of Missouri.

Improvements in the administration of criminal justice in the courts of Missouri have resulted, we believe at least in part, from the mutual recognition of the practical impact of the decisions of Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); and Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). Those cases command that the District Courts of the United States exercise habeas corpus jurisdiction in cases involving state prisoners, subject to applicable principles of exhaustion of

---

9. State v. Jones, 79 Mo. 441 (1883), shows what eventually happened to defendant Emmett Jones. After the reversal of his first conviction he was retried, convicted, and sentenced to be hanged. The conviction was affirmed. The Supreme Court of Missouri was able to say on his second appeal that "counsel assigned to the defense of the accused has shown commendable zeal in conducting it" (79 Mo. at 442). All possible doubt about the guilt of the accused was thereby removed, and justice was administered in a civilized manner.

available state court remedies (see White v. Swenson, (W.D.Mo., en banc 1966) 261 F.Supp. 42) at a point much earlier than theretofore had been the rule. Prior to the decision of those three cases a state prisoner was required under Darr v. Burford, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761 (1950), to seek certiorari in the Supreme Court of the United States before he could seek federal habeas corpus relief in a District Court. Other obstacles formerly reduced the number of cases in which a state prisoner could, as a practical matter, raise an effectiveness of counsel question. Williams v. Kaiser, 323 U.S. 471, 65 S.Ct. 363, 89 L.Ed. 398 (1945), and Tomkins v. State of Missouri, 323 U.S. 485, 65 S.Ct. 370, 89 L.Ed. 407 (1945), are examples of what a state prisoner in Missouri faced before the Supreme Court of Missouri recently made fundamental changes in its post-conviction procedures. Habeas corpus petitions formerly were allowed to be filed in the Supreme Court of Missouri *in forma pauperis,* but were denied out of hand for the reason that the petition "fails to state a cause of action." See 323 U.S. at 473, 65 S.Ct. at 365, and 323 U.S. at 486, 65 S.Ct. at 371. (Under present practice, the Supreme Court of Missouri directs the prisoner to commence his post-conviction proceeding in the committing court under Rule 27.26 of that court).

When the Supreme Court of the United States overruled Darr v. Burford, as a practical matter, it required the United States District Courts to exercise jurisdiction to hear and determine all alleged violations of federal constitutional law that may have occurred during the processing of a state criminal case immediately after a federal constitutional question has been finally decided on the merits by the state courts. The determination of an alleged violation of the federal constitutional right to the effective assistance of counsel is a federal question and its resolution controlled by the decisions of the Supreme Court of the United States. Under the command of the Supremacy Clause in Article VI of the Constitution, this Court cannot defer to state court standards concerning the effective assistance of counsel that do not articulate and apply federal constitutional principles to the facts of a particular case.[10]

Mutual recognition of the fact that most long term state prisoners will seek, and under appropriate circumstances obtain, federal court review of all federal questions decided either on direct appeal or pursuant to state postconviction procedures, has required that State courts become as familiar with the decisions of the Supreme Court of the United States as the lower federal courts. There has been, of course, a time lag in the process

10. It is therefore not appropriate for us to comment in detail on the apparent Missouri rule of decision. It must be noted, however, that in ruling the federal question presented in this case, the Supreme Court of Missouri cited and relied only on its own decision in State v. Turner, Mo.Sup.1962, 353 S.W.2d 602, and on some general statements from C.J.S. In his brief filed in this Court the Attorney General of Missouri cited only State v. Turner and another Supreme Court of Missouri case.

Neither State v. Turner nor any of the many other Missouri cases that seem to hold that proof of negligence or of want of skill of defense counsel in the trial of a criminal case can not, under any factual circumstance, amount to ineffective assistance of counsel, even so much as cite any of the numerus controlling Supreme Court of the United States cases. Examples of such cases in addition to this case and State v. Turner are the frequently cited cases of State v. Childers, Mo.Sup. Div. 1, 1959, 328 S.W.2d 43; State v. Worley, Mo.Sup.Div. 1, 1963, 371 S.W. 2d 221; State v. Franklin, Mo.Sup.Div. 2, 1964, 379 S.W.2d 526; State v. Hooper, Mo.Sup.Div. 1, 1966, 399 S.W.2d 115; and State v. Keeble, Mo.Sup.Div. 2, 1966, 399 S.W.2d 118. The rule apparently announced in those cases is in sharp contrast to the principles stated in the early Missouri case of State of Missouri v. Jones, 12 Mo.App. 93 (1882). So far as we know, that Missouri case was the first case in the United States that reversed a conviction because of ineffective assistance of counsel. See and compare State of Missouri v. Lewis, 9 Mo.App. 321 (1880).

of State court application of those controlling decisions to questions that various State courts had formerly decided by reference only to their own rules of decision. In particular States and in particular areas of the criminal law administered in many States, some state rules of decision developed largely uninfluenced by and, in some infrequent instances, directly contrary to long standing constitutional standards established by the Supreme Court of the United States.

The State court cases which we discuss in this case illustrate that State and federal courts are equally devoted to the administration of criminal justice. As time goes on, we believe it is unreasonable to foresee even apparent future conflict in the application of any principles of federal constitutional law announced by the Supreme Court of the United States.

## V.

We look now to recent cases from the State and federal courts in which the principles of the Sixth and Fourteenth Amendments have been discussed and applied to factual situations similar to that presented by this case. We note at the outset the observation of Justice Roberts of the Supreme Court of Pennsylvania in Commonwealth ex rel. Washington v. Maroney, (1967) 427 Pa. 599, 235 A.2d 349, at 351, that "courts have employed a variety of formulae—'a mockery of justice', 'the * * * absence of judicial character in the proceedings as a whole,' 'a travesty,' 'a sham,' or 'a farce' —to characterize the degree of degeneration of the proceedings necessary before a finding of ineffective representation should be made." [Footnotes and citations therein omitted]. He added that "whatever the applicable characterization, a court is compelled to test, at least in some minimal way, the effectiveness of counsel's efforts." [Id. 235 A.2d at 352]. The Supreme Court of Pennsylvania, we think quite properly, stated that:

We approach such a task always mindful of the presumption that counsel is competent and with the realization that no one, be they members of bench or bar, relishes an opportunity to evaluate the product of another attorney. [Id. at 352].

In that case, as in this, defense counsel failed to object to a confession upon which the state's entire case rested. The court determined that counsel's failure could be explained only on the ground of "insufficient preparation" and "lack of knowledge of a possible coercion claim." Because the court could "find no reasonable legal basis to support counsel's failure to object" it determined that the defendant had been "deprived of effective assistance of counsel" [Id. at 356].

That case pointed out that "the assumption that an allegation of ineffective assistance attacks trial counsel's general competence" is an erroneous assumption. "The issue," said the Supreme Court of Pennsylvania, "is not counsel's reputation or his ability, but his stewardship of the challenged trial" [Id. at 356]. The court emphasized that "both counsel and the courts must recognize that the main issue is whether the accused's rights have been adequately protected; the defense counsel is not on trial but rather his aid is sought to further this inquiry."

The recitation of the Supreme Court of Missouri in In re *Goodwin* that petitioner's trial counsel "is an able lawyer who had had previous experience in the trial of criminal cases, including the defense of persons charged with murder" (359 S.W.2d at 601) is totally beside any relevant point; the question in a Sixth Amendment case is whether one who may well be an admittedly able lawyer did or did not render effective assistance in the defense of an accused under all the facts and circumstances of the particular case. The most able and competent lawyer in the world can not render effective assistance in the defense of his client if his lack of preparation for trial results in his failure to learn of readily available facts which might have

afforded his client a legitimate justiciable defense.[11] Our determination of this case is not an adjudication that Mr. Swinton generally is not a competent and able lawyer; that question is not in issue. This case determines only that the assistance which Mr. Swinton was able to render in the defense of the petitioner, under all the facts and circumstances of this case, did not comply with the command of the Constitution of the United States.

The long standing rule of the Eighth Circuit has generally been expressed in language that has used such words as "travesty," "sham," "farce," or "mockery of justice." Over twenty years ago, the Eighth Circuit in Maye v. Pescor, (8th Cir. 1947) 162 F.2d 641, at 643, stated that "the mere appointment of counsel, no matter how able, for a defendant charged with commission of crime without opportunity to consult, advise or to make such preparation for arraignment and trial as the facts of the case fairly demand would be a travesty and would not satisfy the requirements of the Fifth and Sixth Amendments. Powell v. State of Alabama, 287 U.S. 45, 71, 53 S.Ct. 55, 77 L.Ed. 158 * * * Glasser v. United States, 315 U.S. 60, 70, 71, 74, 62 S.Ct. 457, 86 L.Ed. 680; Avery v. State of Alabama, 308 U.S. 444, 446, 60 S.Ct. 321, 84 L.Ed. 377."

The Eighth Circuit's most recent statement of the rule is Cross v. United States, (8th Cir. 1968) 392 F.2d 360, at 366. It there said:

> This Court recently restated the applicable general rule in Cardarella v. United States, 375 F.2d 222 (8 Cir. 1967):
>
> > The rule applicable is that a charge of inadequate representation can prevail 'only if it can be said that what was or was not done by the defendant's attorney for his client made the proceedings a farce and a mockery of justice, shocking to the conscience of the Court.' [citations omitted] 375 F.2d at 230.

It is quite apparent that the cases do not turn on the formal language used by a particular court to state the applicable rule. In People v. Ibarra, (1963), 60 Cal.2d 460, 34 Cal.Rptr. 863, 386 P.2d 487, for example, the Supreme Court of California was presented with a case in which defense counsel had failed to object to evidence obtained pursuant to what could well have been an illegal search and seizure. The court first stated its rule in the Eighth Circuit's "farce or sham" language:

> To justify relief on this ground, "an extreme case must be disclosed." (Maye v. Prescor, 8 Cir., 162 F.2d 641, 643; see Fellman, The Defendant's Rights (1958) p. 124; Fellman, The Right to Counsel Under State Law, Wisc.L.Rev. (1955) 281, 314; 4 U.C.L.A.L.Rev. 400, 403; State v. Benge, 61 Iowa 658, 662, 17 N.W. 100.) It

11. Even the great Thomas Erskine would not have been able to obtain the acquittal of James Hadfield if he had not investigated the facts of that case. Hadfield, as is well known, was indicted for the attempted assassination of King George III. All of the audience in Drury Lane Theatre saw Hadfield fire a pistol at the King of England. Erskine, as appointed counsel, said that "when the court put the prisoner under my protection, I thought it my duty to bring Mr. Cline * * * one of the first anatomists in the world * * * to inspect him at Newgate." Erskine thereafter interviewed Dr. Creighton, who examined Hadfield and later testified that he did not have "the smallest doubt that he was insane." Erskine located thirty-two witnesses to prove, in the words of Lord Kenyon, the trial judge, that at the time Hadfield "committed this offense, and a most horrid one it was, he was in a very deranged state." The full story is told in Chapter III, pages 369–386 of Stryker's biography of Erskine, "For the Defense," Doubleday & Company, Inc. (1947). Had Erskine not investigated his case, the first successful defense of insanity would not have occurred one hundred and sixty-eight years ago.

must appear that counsel's lack of diligence or competence reduced the trial to a "farce or a sham." [Citing cases]. [Id. 34 Cal.Rptr. at 866, 386 P.2d at 490].

That court made clear that a finding that counsel had in fact violated his duty to render effective defense assistance converts a trial into a "farce" or a "sham" as a matter of law. It stated that "it is counsel's duty to investigate carefully all defenses of fact and of law that may be available to the defendant, and if his failure to do so results in withdrawing a crucial defense from the case, the defendant has not had the assistance to which he is entitled." [Id. 34 Cal.Rptr. at 866, 386 P.2d at 490].

The California court determined as a matter of fact that trial counsel simply did not know of the applicable rule of law under which a defendant could challenge the legality of a search and seizure. The effort to explain counsel's failure to protect the defendant's rights on the theory that his failure properly to object was a part of some sort of "trial strategy" was held to be untenable. The Supreme Court of California stated that:

> Counsel's failure to research the applicable law precluded the exercise of judgment on his part and deprived defendant of an adjudication of what was clearly the stronger of the two defenses available to him. * * * Counsel's failure to object precluded resolution of the crucial factual issues supporting defendant's primary defense. It thereby reduced his trial to a farce and a sham. [Id. 34 Cal.Rptr. at 867, 386 P.2d at 491].

The Third Circuit in United States ex rel. Mathis v. Rundle (3rd Cir. 1968) 394 F.2d 748, at page 750, stated that

"the criteria for measuring adequate representation have in the past often been articulated on a highly abstract plane, in conclusory language." That court, however, as did the Eighth Circuit in Cross v. United States, supra, 392 P.2d at 367, quoted the same language from Glasser v. United States, supra, that we quoted above to indicate that niceties of language were to be avoided in cases involving the "fundamental and absolute" right to the assistance of counsel. In its most recently decided case, the Third Circuit adopted the burden of proof rule established by the Fourth Circuit for the determination of questions concerning the effectiveness of counsel's assistance. In so doing, it stated that "the hopeful practical consequence of our rule thus enunciated will be that the states and their judicial systems in the Third Circuit will become more careful in permitting appointed counsel to fulfill in a realistic manner the function which they should have been responsibly assuring all along."[12]

The Fourth Circuit has seemingly had more than its share of ineffective counsel cases. In Coles v. Peyton, (4th Cir. 1968), 389 F.2d 224, at 226, that court summarized the principles established in a long line of Fourth Circuit decisions. It stated that:

> The principles may be simply stated: Counsel for an indigent defendant should be appointed promptly. Counsel should be afforded a reasonable opportunity to prepare to defend an accused. Counsel must confer with his client without undue delay and as often as necessary, to advise him of his rights and to elicit matters of defense or to ascertain that potential defenses are unavailable. Counsel must conduct appropriate investigations, both factu-

12. How the "practical consequence" of the Third Circuit's rule "will be that the states and their judicial systems in the Third Circuit will become more careful" is developed in Part IV of this opinion. The burden of proof rule in the Fifth Circuit is substantially the same as that of the Fourth. See Mosley v. Dutton, (5th Cir. 1966) 367 F.2d 913, at 916. It is not necessary for us to make, and we therefore refrain from making, any definitive ruling on the burden of proof question to which we have made reference. We do not reach that question in ths case for the reason that we find and determine that petitioner assumed and carried the burden of proof throughout the proceedings in this Court.

al and legal, to determine if matters of defense can be developed, and to allow himself enough time for reflection and preparation for trial.[3] An omission or failure to abide by these requirements constitutes a denial of effective representation of counsel unless the state, on which is cast the burden of proof once a violation of these precepts is shown, can establish lack of prejudice thereby.

Footnote 3 added that "as we stated in Jones v. Cunningham, 313 F.2d 347, 353 (4 Cir. 1963) ' * * * it is not for the lawyer to fabricate defenses, but he does have an affirmative obligation to make suitable inquiry to determine whether valid ones exist.' "

· A comparison of People v. Ibarra, supra, which articulated the applicable rule in terms of "farce or sham," with Coles v. Peyton, which simply states what counsel must do at a minimum in order to render effective assistance, reveals that the variations in the statement of the rule do not have any real effect on the result commanded by the facts established in a particular case. Coles v. Peyton was a forcible rape case. It was established as a mater of fact that "counsel made no investigation of the reputation of the prosecutrix for chastity. Counsel made no attempt to determine the identity of, or to interview, the prosecutrix's male companion. Counsel made no attempt to interview Carrie Herbert or to determine what her testimony would be. Counsel did not explain the elements of the crime of forcible rape to petitioner, including the necessity of proof of penetration, and question him in regard thereto. In short, counsel did no more than interview petitioner on the three occasions previously alluded to ·and to accept the statements he made to them during the interview. Counsel were unequivocal that they did not know that the prosecutrix had been examined medically and that they had no knowledge of the written, signed medical report." [Id. 389 F.2d at 226].

The court held that the failure of counsel to make proper investigation, in the absence of affirmative proof by the state of lack of prejudice, established that petitioner was denied effective assistance of counsel and that he should be granted a writ of habeas corpus, subject to being retried.

Smotherman v. Beto, N.D.Tex.1967, 276 F.Supp. 579, presented a factual situation comparable in many respects to that presented in this case. The charge was rape, a capital offense. A one day trial was involved. Defense counsel failed to object to a confession. His attempted explanation was that the defense was insanity. But in that case, as in this, no medical evaluation of the defendant was sought or undertaken. The defendant was presented as the sole witness to his own mental incompetency. After making careful analysis of the evidence developed at full evidentiary hearing held in the federal court, Judge Taylor stated that "the long and short of [it] is that court-appointed counsel did not investigate, he did not inquire, he did not prepare." [Id. at 588]. In regard to the use of the defendant as his own witness on the insanity issue, the court somewhat bluntly stated that "only the most naive would contend that such an opinion is not most properly the province of the medical expert." [Id. at 586]. In language that is appropriate to the factual situation presented by this case, the court stated:

> Counsel never questioned the legality of petitioner's confession when it was read to the jury. His reason for this line of inaction was grounded on the fact that the defense was insanity. It is, of course, one thing for a lawyer to calculate his defensive strategy and quite another to be unaware of the facts of the case. [Ibid.]

In Kibert v. Peyton, (4th Cir. 1967) 383 F.2d 566, as in this case, it was established as a matter of fact that the defendant's "attorney prior to trial had serious doubts as to Kibert's mental condition." (Id. at 568). Yet defense counsel put those doubts aside and, without requesting a mental examination of the defendant, entered a plea of guilty.

With particular emphasis on Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), the court granted habeas corpus relief because defense counsel's failure "to explore the matter [of defendant's competency to stand trial] and adduce evidence in court where there was reason for doubt as to the mental condition of the accused, constituted a denial of his right to effective assistance of counsel." (383 F.2d at 569).

In Brooks v. State of Texas, (5th Cir. 1967) 381 F.2d 619, as in this case, the defendant's "own written confession made it clear that there was no reasonable possibility of a successful defense except on the ground of insanity." (Id. at 620). The prosecuting attorney had the defendant examined by a psychiatrist but defense counsel did not seek or obtain a copy of the doctor's report. In that case, as in this, the court found that the proceedings evidenced "appointed counsel's totally inadequate preparation of [defendant's] only possible defense—that of insanity." [Id. at 622]. That case held that the "trial was no more than a mockery of justice" and directed that a writ of habeas corpus be granted.[13] It also stated that:

> An indigent defendant is entitled to the effective assistance of counsel. Any experienced trial lawyer knows that a purported trial without adequate preparation amounts to no trial at all. [381 F.2d at 624].

Greer v. Beto, (5th Cir. 1967) 379 F.2d 923, another Fifth Circuit case, involved both "a determination of sanity at the time of the offense and at the time of the trial." Petitioner's originally appointed counsel properly sought and obtained a pretrial sanity hearing. Original counsel were allowed to withdraw and new defense counsel was appointed to try the case on the merits. But at the later trial on the merits, and in spite of the fact that a separate pretrial sanity hearing had been conducted, "there was a complete absence of medical testimony" [Id. at 925]. Those facts were held to make out a "prima facie case of ineffective or inadequate assistance of counsel" and the case was sent back to the district court for full exploration at evidentiary hearing of all the facts relating to defense counsel's conduct of the trial. See also Hintz v. Beto, (5th Cir. 1967) 379 F.2d 937, for another not dissimilar situation. And see Owsley v. Peyton, (4th Cir. 1966) 368 F.2d 1002, holding that the failure of defense counsel to adduce proof of defendant's mental condition when evidence was available to establish reasonable cause for a mental examination rendered his representation of defendant ineffective in a constitutional sense.

The facts of the case at bar present a more extreme factual situation than any presented in the cases just discussed. Defense counsel's failure in this case to make any sort of investigation resulted in the concealment of a medical diagnosis of psychosis made the very day that defendant gave the police the oral statement which was partially responsible for his death sentence. If it had been established, as it well might have been, that petitioner "was insane and incompetent at the time he allegedly confessed," the principles stated in Blackburn v. State of Alabama, 361 U.S. 199, 80 S.Ct. 274, 4

---

13. It should be noted that although Judge Rives used the "mockery of justice" language in stating the rule, he also quoted from Judge Murrah's opinion in Willis v. Hunter, (10th Cir. 1948) 166 F.2d 721, at 723, in which the Tenth Circuit rule was stated in language quite similar to that used by Judge Winter to state the Fourth Circuit rule in Coles v. Peyton. The language of Judge Murrah quoted in Brooks v. State of Texas was:

> We think that the right to the effective assistance of counsel contemplates the guiding hand of an able and responsible lawyer, devoted solely to the interest of his client; who has ample opportunity to acquaint himself with the law and facts of the case, and is afforded an opportunity to present them to a court or jury in their most favorable light.

L.Ed.2d 242 (1960), would have come into play. It was there stated that:

> Surely in the present stage of our civilization a most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane; and this judgment can without difficulty be articulated in terms of the unreliability of the confession, the lack of rational choice of the accused, or simply a strong conviction that our system of law enforcement should not operate so as to take advantage of a person in this fashion. [Id. at 207, 80 S.Ct. at 280].

We are convinced that, had the State trial judge been advised that petitioner had been released from General Hospital to police custody for the purpose of his transfer to the Mental Hospital at Fulton for further evaluation of his psychotic condition, he would not have ordered petitioner's trial to commence on November 30, 1959. Indeed, had defense counsel made any sort of proper investigation of petitioner's mental condition he might well have developed evidence which would have established that petitioner was not in fact legally competent to stand trial on November 30, 1959. Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed. 2d 815 (1966), recently reaffirmed the prior holding of Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956), that the conviction of an accused person while he is legally incompetent to stand trial violates due process as guaranteed by the Fourteenth Amendment. Defense counsel's failure to investigate prevented adequate development of the facts upon which this important federal constitutional question would have turned.

■ In light of our determination that petitioner is entitled to appropriate habeas corpus relief, we add a word concerning the impact of another facet of Pate v. Robinson on any new trial of the petitioner. Under the facts presented in that case the Supreme Court of the United States found that sufficient evidence of the accused's mental condition had been adduced to entitle him to a hearing on the issue of his competency to stand trial. It accordingly held that "the [trial] court's failure to make such inquiry thus deprived Robinson of his constitutional right to a fair trial" [383 U.S. at 385, 86 S.Ct. at 842] and directed that "the writ of habeas corpus must issue and Robinson be discharged, unless the State gives him a new trial within a reasonable time" [Id. at 386, 86 S.Ct. at 842]. Pate v. Robinson made clear that:

> If the State elects to retry Robinson, it will of course be open to him to raise the question of his competence to stand trial at that time and to request a special hearing thereon. In the event a sufficient doubt exists as to his present competence such a hearing must be held. If found competent to stand trial, Robinson would have the usual defenses available to an accused. [Id. at 387, 86 S.Ct. at 843.]

The final diagnosis of psychosis on the General Hospital record is sufficient evidence to require an appropriate pretrial hearing on the question of petitioner's competency to stand trial. If found to be competent to stand trial, it is also apparent that complicated problems of medical evidence are presented by the additional and separate questions of petitioner's mental condition at the time of the offense and at the time the statement of June 25, 1959 was taken. Compare Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

We are confident that if the State of Missouri elects to retry petitioner, he will be afforded the opportunity "to have all issues which may be determinative of his guilt tried by a state judge or a state jury under appropriate state procedures which conform to the requirements of the Fourteenth Amendment." Rogers v. Richmond, 365 U.S. 534, at 547–548, 81 S.Ct. 735, at 743, 5 L.Ed.2d 760 (1961).

Pursuant to Rule 52(a) of the Rules of Civil Procedure, this memorandum opinion shall serve as our findings of fact and conclusions of law.

We express our appreciation and commend Granville E. Collin, Esq., and Professor Edward H. Hunvald, Jr., for the services rendered petitioner under appointment by this Court. That service, rendered without compensation, has been in the highest tradition of the Bar.

We believe that it should be added that petitioner would not have lived to litigate except for the efforts of Mortimer A. Rosecan, Esq., and Orville Richardson, Esq., of St. Louis (who assisted Mr. Rosecan on the briefs). They are also to be commended for their efforts on petitioner's behalf. The Tentative Draft of the American Bar Association Project on Minimum Standards for Criminal Justice, at page 13, states as the first general principle of its recommended Standards relating to Providing Defense Services (1967), the following: "The objective of the bar should be to ensure the provision of competent counsel to all persons who need representation in criminal proceedings and to educate the public to the importance of this objective."

The Bar of Missouri is challenged by the example set by the four men we have named.

## ORDER

For the above stated reasons, petitioner is entitled to the relief sought in the petition. In accordance with the policy considerations implicit in this Court's order in Jedby v. Swenson, (W.D.Mo.1966) 261 F.Supp. 209, 214, it is

Ordered that petitioner is entitled to the relief prayed for but that the writ shall not issue for a period of thirty (30) days in order to afford the State of Missouri, through its Attorney General, the opportunity to have petitioner's conviction set aside or declared to be invalid, to have counsel appointed, and to begin new trial proceedings; it is further

Ordered that if no such new trial proceedings are begun within thirty (30) days from the date of this order, the writ shall issue; it is further

Ordered that if such trial proceedings are begun within thirty (30) days from the date of this order, this Court will delay the issuance of the writ until such time as the situation calls for further disposition of this case; it is further

Ordered that the Attorney General keep this Court advised of all proceedings that may be taken consistent with our stay of the issuance of the writ.