**Robert Lee WALKER, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. 58208.**

Supreme Court of Missouri,
Division No. 1.

July 22, 1974.

Donald L. Schmidt and Christopher Hexter, for movant Legal Aid Society of St. Louis, St. Louis.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for respondent.

HIGGINS, Commissioner.

Appeal from denial, after evidentiary hearing, of motion under Rule 27.26, V.A.M.R., to vacate and set aside judgment and sentence to life imprisonment for murder, first degree. (Appeal taken December 21, 1972; jurisdiction retained pursuant to order of April 9, 1973; Parks v. State, 492 S.W.2d 746 [Mo. banc 1973.])

The sentence in question was imposed on a plea of guilty April 28, 1971, to run concurrently with a sentence to life imprisonment imposed the same date in cause number 309155 in St. Louis County, on a jury verdict of guilty of murder, first degree.

The transcript of proceedings on the guilty plea in question shows that Robert Lee Walker was present in open court with counsel, Joseph Noskay, Public Defender of the City of St. Louis, and Samuel Vandover of the St. Louis County Public Defender Bureau.

Mr. Vandover asked and secured leave to withdraw defendant's former plea of not guilty to the indictment charging murder, first degree, waive formal reading of the indictment, and enter a plea of guilty to the indictment.

Mr. Noskay asked and secured leave to withdraw defendant's motion for appointment of and examination by a psychiatrist and advised that defendant was ready for disposition of his case. Mr. Noskay, Mr. Babione, Mr. Vandover, and the defendant signed the court memorandum to accomplish this purpose.

The State's attorney, at the request of the court, recited that "on Friday, November the 28th, 1969, in the City of St. Louis at or about five p. m. * * * at * * * 2630 Madison, the defendant entered * * * and spoke with the victim, * * * Clyde T. Hemphill. A situation occurred wherein the defendant, as he was leaving this particular tavern, turned, and the victim was getting off of a bar stool * * *; whereupon the defendant shot five to six times, striking the victim, killing him * * *. The victim was driven to the City Hospital No. Two, where he was observed by Dr. Chung with multiple gunshot wounds of the neck, chest and abdomen, and had expired, the same day, at 6:35 p. m. * * *."

"THE COURT: Mr. Walker, you've heard the statement * * * outlining the acts which the State alleges that you committed which constitute the charge of Murder First Degree; do you admit that you committed those acts? MR. WALKER: Yes, your Honor. THE COURT: All right. Do you understand the charge against you? MR. WALKER: Yes, your Honor. THE COURT: In arriving at your decision to enter a plea of guilty have you had the advice and assistance of a lawyer? MR. WALKER: Yes, your Honor. THE COURT: Do you understand that you would be entitled to a trial by jury on this offense? MR. WALKER: Yes, your Honor. THE COURT: Do you understand that you would have the right to confront the witnesses against

you on this charge? MR. WALKER: Yes, your Honor. THE COURT: And that by pleading guilty you're waiving your right to confront those witnesses? MR. WALKER: Yes, your Honor.

"THE COURT: Do you understand that a guilty plea is a confession of guilt to the offense charged and that by pleading guilty you are thereby waiving your privilege against self-incrimination? MR. WALKER: Yes, your Honor.

"THE COURT: Have you been threatened or coerced in any manner by anyone so as to cause you to plead guilty? MR. WALKER: No, your Honor. THE COURT: Were any promises made to you by anyone that have caused you to plead guilty to the offense charged? MR. WALKER: No, your Honor. THE COURT: Do you understand that if any promises were made to you by anyone, including the Circuit Attorney and your own attorney to induce you to plead guilty, that the Court would not be bound by any such promises? MR. WALKER: Yes, your Honor.

"THE COURT: Do you realize that the judge will set the sentence in this case? MR. WALKER: Yes, your Honor. THE COURT: Are you aware of the penalty range of the offense of Murder First Degree? MR. WALKER: Yes, your Honor. THE COURT: All right. And being aware of all these facts is it still your wish to plead guilty to the offense with which you are charged? MR. WALKER: Yes, your Honor. THE COURT: Is your plea of guilty being given by you freely and voluntarily? MR. WALKER: Yes, your Honor."

The court granted allocution at which time Mr. Vandover specifically advised "that on the charge in St. Louis County I represented him; we entered a plea of not guilty by reason of mental disease or defect; and, as you know, there is a presumption of sanity, and there was a finding of fact that the presumption was not overcome and he was, in fact, sane; and,

as a result thereof, a jury did sentence him in accordance with their finding of guilty on Murder First Degree for the rest of his natural life in the Missouri Department of Corrections.

"THE COURT: So then, I take it, it is your feeling and belief and understanding that, at this time, Mr. Robert Lee Walker is competent and is sane? MR. VANDOVER: That is my understanding, yes, Judge. Mr. Walker does understand the nature of the proceedings now taking place here and is and has been able to cooperate in his defense; I'm sure he's competent to understand what is taking place here today. THE COURT: All right, sir, the record will so show."

The court then imposed the life sentence in question.

On September 20, 1972, Robert Lee Walker filed his motion under Rule 27.26, and hearings were accorded movant on November 17 and 22, 1972.

Robert Lee Walker gave this version of the facts. He stated he had never met with one of his appointed counsel, Mr. Babione; however, he was represented by a lawyer from the Public Defender's office (Mr. Noskay) when he was "arraigned for second degree murder" in June, 1970. At that time they talked for five minutes or so about his plea of not guilty by reason of mental disease or defect. On April 28, 1971, he was in the St. Louis County jail where he had been held for trial on a charge of murder, first degree, upon which a jury had convicted him. He was represented on that charge by Sam Vandover, and he had been examined by a psychiatrist, Dr. Flynn, who testified at his trial. He was sentenced to life imprisonment on his St. Louis County conviction at 10:30 or 11 a. m., April 28, 1971. While in jail he had received prescription drugs and had saved a number of pills, nine of which he took around 9 a. m. They made him feel groggy and he slept for about an hour and a half before he went to court. After sentencing in the county, he was taken to St.

Louis City Circuit Court, arriving around noon. He still felt groggy. He saw a lawyer whom he took to be Mr. Babione who was Mr. Noskay. In the afternoon he talked with Mr. Vandover, and "he told me that if I pleaded guilty to the charge that a life sentence was all I could get, and I was still assuming or at least thought that the charge was second degree murder and that if I got a life sentence it really didn't make any difference." Mr. Vandover had not discussed the city case with him previously except "just superficially." He had no conversation with the lawyer he thought to be Mr. Babione about his right to jury trial.

On cross-examination movant acknowledged his colloquy with the court when he pleaded guilty and his discussion with Mr. Vandover.

Upon examination by the court, movant stated he was examined also at Fulton State Hospital and "there was a conflicting opinion by the doctors * * *."

Robert C. Babione, an attorney with the Public Defender Bureau of the City of St. Louis, was assigned the file in the city case against Robert Lee Walker. He never talked to the client personally, and was not present at the plea proceedings or the arraignment. He talked to the client on the telephone one time between the trial in St. Louis County and the plea in the city. The conversation "covered the case in general. * * * I previously had been in contact with Mr. Vandover so I discussed the status of the county case, discussed the possible dispositions of the case here in the city, and the factual problems of the case itself. * * * With reference to the county case he indicated that the trial had been completed, was awaiting sentencing. He had discussed with Mr. Vandover what should be done with the Motion for a New Trial * * * and it seems that the conclusion of those discussions was that they would at most proceed with the sentencing and file the Notice of Appeal so that in the event the case was tried down here he

would not have a conviction with which he could be impeached. However, they had no serious intention, as far as I know, of appealing that case. They felt that the fact that the jury returned a verdict of life was a substantial victory, did not care to try it again.

"With reference to the situation on the city case, I had previously been in contact with Mr. Leo MacDonald, who was the prosecutor of the case, and although this case was older than the county case the State here in the City took the position of wanting to delay on it and would make a disposition depending on what happened in the county; if a death sentence was rendered they might have dismissed it here; with a life sentence they would run something to be concurrent with it; if acquitted in the county they would probably reduce the city charge to a charge of Murder in the Second Degree and make a recommendation in the neighborhood of 12 to 15 years, something like that. * * *

"The final part of the conversation as I recall was about the facts of this case. I had previously done some investigation on the matter, I had received the coroner's report, I had gotten a copy of the statement that he had made in connection with it, I had gone to visit the scene, I believe it was at Madison and 22nd Street, something like that, a bar there. The statement indicated some witnesses might be available to corroborate the part of the statement about the champagne cork popping before the starting of the incident, and I had probably in a prior setting given commands to the sheriff to subpoena these people. I don't believe they were actually located, and the matter was disposed of before the next trial date, I don't know what happened to those subpoenas.

"So I discussed in general what his position on it was, the statement he had made and so on, advised him what my opinion was about what would happen if he went to trial, what the advantages were, what the disadvantages would be and this kind

of thing, what the State might do in the event that the charge would be reduced, whether they'd reduce the charge to Murder Second, and so on."

He was not present at the plea proceedings. His superior, Mr. Noskay, went to court then and he had also been informed that Mr. Vandover would handle the matter and act as defendant's counsel.

Cross-examination of Mr. Babione elicited further evidence of his efforts on behalf of the client.

"At the time it was pending I had prepared a Motion for the Appointment of a Psychiatrist, * * * I had several conferences with Mr. Leo MacDonald * * * which would have involved, oh, half an hour to an hour apiece; I secured the transcript of the coroner's inquest, and I reviewed that, that would have taken, oh, maybe an hour altogether; I visited the scene, where the thing occurred, and looked for the witnesses there, I believe they had addresses at that place; I can't recall if I took photographs or not, I don't believe I did, that would have involved an hour or so of work; I had several conferences with Mr. Vandover, particularly on * * * the psychiatric issue * * *. I think the final arrangement was Mr. MacDonald was going to obtain copies of the psychiatric reports that had been used in St. Louis County and would provide me with copies of that. * * * The court file indicates that Mr. Hubel was present at arraignment and I think it was information that he gave to me plus the fact that the county charge ·was pending and a psychiatric defense was being relied on out there * * * and then I had to do some research into the problem of admissibility of some of the evidence which was involved, namely, the defense was a claim of self-defense, as I understood it, and the shooting which resulted in the death of the other man was begun after the loud popping noise as if a champagne bottle was being opened; and I had known that they had been unable to find the witnesses, the sheriff had not apparently succeeded in serving them so the problem was how I would get corroboration of that into evidence. * * * Then I spent some time * * * periodically reviewing the file because it had been on the docket several times in the city; and I agreed, and Mr. Vandover seemed to concur, that the city case should be postponed until the county case was disposed of, I was never sure the court would in fact continue it so each time it was on the docket I would have spent some time reviewing my file just making sure I had the facts clearly in mind and had an idea what I would do, and so on, if it was not continued.

"* * * At the conclusion of my conversation with Mr. Walker he hadn't decided what he wanted to do, and we discussed the fact he was dealing with Mr. Vandover and I'm quite sure it was agreed that Mr. Vandover would take up any further discussions with him along those lines * * *."

Samuel T. Vandover, an attorney with the St. Louis County Public Defender Bureau, first "represented Robert Walker for about a year and a half that he was awaiting trial in the county. During the course of that year and a half I had occasion to talk with him in excess of 20 or 30 times. One time I talked to him in Fulton * * * at the State Hospital there where I had him sent for a period of evaluation over a 60-day period. Now as I recall the trial lasted a week and the verdict came back on a Saturday evening, and that evening that the jury came back I had a long conversation with Mr. Walker's mother * * * to explain to her what the consequences of the verdict were, and * * * after talking to her I * * * went to the jail and talked with Robert Walker, to explain to him what the alternatives were that were available to him with regard to his appeal from the verdict of guilty and the sentence of life or the fact that he could waive the right to appeal, and asked him whether or not he would be interested in waiving his right to appeal if I were

able to negotiate with the Circuit Attorney's Office a disposition on the murder case pending in the city for a concurrent life sentence, the theory being that, having talked with a number of people more knowledgeable than I in this particular area, that on a life sentence it is not unusual for a person to be released after 15 years or after five or six years becoming eligible for parole. If he were to go up to the penitentiary on a consecutive life of course his chances for parole would be virtually eliminated. And for that purpose I discussed that alternative with Robert Walker on that Monday.

"I believe then several days went by and I have occasion to know that he had the opportunity to discuss this matter with his mother, a face-to-face conversation in the jail. Then after she had her conversation with him she came down and we talked. I went back up several days later, talked to Robert Walker and explained to him that I had talked with the Public Defender's Office in the city, with the Circuit Attorney's Office in the city, that the disposition that I had talked with him about earlier had been made; that upon his plea of guilty to the charge in the city that a concurrent life sentence would be imposed. He indicated to me at that time that that's what he wanted to do. And then I think it was the following day I made arrangements with Judge Kelly for him to impose the sentence returned by the jury and made arrangements with the welfare deputies from the Department of Welfare in St. Louis County to convey him to the Circuit Court in the City of St. Louis for the purpose of disposing the murder charge pending there."

The guilty plea to the city charge was entered between 10:30 to 11:30 a. m. Mr. Noskay was present and Mr. Vandover entered his appearance as cocounsel for defendant.

"Up in the jail, prior to the defendant being taken to Division 7 of the St. Louis County Circuit Court where Judge Kelly was presiding then, I went to the jail with a waiver of a right to appeal from the verdict of the jury in the St. Louis County murder charge, and I guess I talked with him approximately 30 minutes explaining to him and making sure that he understood what the consequences were if he were to sign this instrument waiving his right to appeal the jury verdict and that he wouldn't have any opportunity to come back and raise any questions of law that may have been violated later on. * * *

"I also explained to him that because of the nature of the charge and the fact that he had a similar charge pending in the city the Court would probably not grant him credit for the time spent in jail awaiting trial or disposition of his two cases, but that I would request that it be given to him because I was trying to get him to understand some of the things that he might not like that were about to happen so that he wouldn't cause any problem in the courtroom, although during the course of the trial he was very calm and frankly had no problems with him at all, but it is just a procedure that I followed in any case, not only this one. But I talked to him about 30 minutes. * * *

" * * * he appeared no differently than he had appeared when I talked to him on previous occasions. He talked fluently, didn't slur any words; he asked quite a few questions, he was basically concerned —I don't know if 'concerned' is the proper word—but he asked numerous questions concerning the number of years that one normally would serve on a life sentence; and I tried to explain to him that it could be the rest of his life, it could be six years, it would more than likely be somewhere in the neighborhood of between 15 and 30 years. He wanted to know what the consequences would be if he were to go to the city and plead, you know, stand on his plea of not guilty, and not guilty by reason of mental disease or defect, and I said, well, if you're found not guilty of course there's no problem, but you still go to the peniten-

tiary for the life sentence on the county charge.

"I remember there was some discussion then about what would happen if he were to try his case in the city and the jury returned a verdict of not guilty by reason of mental disease excluding responsibility. I indicated that then you'd probably be worse off, or you'd be in the same situation that you'd be in if you had consecutive life sentences; probably a worse situation for the reason that if he were to be committed to Fulton he would not be able to be released until the members of the staff there * * * felt that he had recovered sufficiently to where he could return to the community without being a harm to himself or others in the community. And then, of course, the prosecutor would be able to agree to that or he could disagree. In that case the prosecutor would have a hearing, require a hearing be held, witnesses, doctors, so forth, would be called by both sides and the Court then would make a ruling as to whether or not he were in effect safe to be released from the Fulton Hopsital, and I said it was my opinion that the likelihood of that happening was not real great. I have yet to see anybody go to Fulton that came back any better off than they were when they went there; and secondly I just didn't feel that the Court would be too inclined to grant any writ of habeas corpus, or whatever they call it, from the mental hospital because of the nature of the charge that he had. I explained to him that then he'd have to go to the penitentiary and finish his life sentence and it's a question as to whether or not any time he spent in Fulton would be time credited towards his life sentence; this was a legal question that perhaps would have to be resolved.

"And I advised him that of course if he wanted to do that he could go down to the city and try the case, but it was my opinion he would be worse off than if he were to go down there and plead guilty and get a concurrent life sentence. But I left it up

to him whether or not he wanted to do that. * * *

"Then I recall the option was discussed as to what would happen if he were to withdraw his plea of not guilty by reason of mental disease or defect excluding responsibility pending in the city charge and proceed just on the plea of not guilty. I indicated that my investigation of the city charge indicated that the odds were fairly good that he probably would not be found guilty of murder in the first degree but that the odds were greater than he would be found guilty of murder second degree and there was a slight possibility that perhaps evidence could be introduced that would warrant a manslaughter instruction * * * although I didn't think that it was the kind of case where a manslaughter charge would be returned. I explained to him that in my opinion the chances of there being a not guilty verdict returned were considerably less than 50/50; in other words, the evidence was weighted against him in that regard.

"In any event, if he were found guilty of Murder Second or Manslaughter the problem then would be, as I explained to him, that he would be sentenced to either somewhere between jail time up to 10 years on Manslaughter or 10 years up to life, or greater than life, or a number of years which would be imposed consecutively with the life sentence imposed in the county, which would virtually eliminate any chance of parole for him, require him to serve probably a greater number of years in the penitentiary than he might otherwise have to serve if he were given concurrent life sentences.

"And I recall that we discussed all these alternatives rather specifically on the morning of the plea of guilty and we had discussed them in a similar fashion at least once and maybe twice during the course of the week preceding his plea of guilty to the charge in the city. * * *

"I explained to him that Judge Corcoran would probably ask him whether or not he

in fact was guilty of what he was accused of having done and that if he wanted to go through with this he would have to admit that he committed the acts that they accused him of committing; and I explained, tried to relate to him some of the questions that the judge would be asking him in view of the fact that he had not ever been through a plea of guilty proceeding before; and as I recall I told him to answer all the questions, give whatever answer he wanted to give. I was rather specific, however, on the question as to whether or not he actually committed the acts he was accused of doing and I indicated there that the judge would not accept a plea of guilty unless the defendant, unless Mr. Walker actually did or was willing to admit those things, and I wanted to make sure he understood that there was no need to go through with the proceeding if he was unwilling to do that."

Defendant made no objection to representation by Mr. Vandover and asked that he be present at the plea proceedings as did his mother. He "looked the judge right in the eye and answered his questions normally."

Cross-examination of Mr. Vandover elicited that he "examined the confession that Robert Walker was alleged to have given the police; I went to the tavern where the shooting took place to see if I could find —I think it was either a barmaid or a bartender; I was unable to find him. My purpose for wanting to find him was to try and confirm the part of the confession that indicated that there was * * * a knife or a gun that the victim had in his hand when Robert Walker shot him. * * * he stated that as his reason for shooting the man. But I couldn't find the people I went there to find. I believe I talked briefly over the telephone to the police officer involved, and Leo MacDonald arranged that for me." At the time he was conducting his investigation of the city charge, he was not intending to represent him on that charge.

Appellant asserts (I) that he, as an indigent defendant charged with first degree murder, has a constitutional right to the effective assistance of counsel which encompasses the right to the appointment of counsel, the right to consultation with counsel, and investigation and preparation for trial by appointed counsel; and (II) that he has a constitutional right to the effective assistance of counsel at every critical stage of the proceedings.

Appellant argues (I) that appointed counsel failed to adequately confer with petitioner, investigate the facts of the case, prepare for a trial, fight for appointment of a psychiatrist, investigate for evidence to support a possible claim of self-defense, be present and assist at the plea hearing; and, therefore, he did not have effective assistance of counsel.

He argues (II) that he did not have assistance of appointed counsel at the critical stages in the proceedings against him when he was arraigned and when he pleaded guilty, and, therefore, he did not have effective assistance of counsel.

There is no question that an accused is entitled to assistance of counsel, Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); that the entitlement is to effective assistance of counsel, United States v. Vasilick, 206 F.Supp. 195 (M.D. Pa.1962), Melanson v. O'Brien, 191 F.2d 963 (1st Cir. 1951), Goodwin v. Swenson, 287 F.Supp. 166 (W.D.Mo.1968); that effective assistance of counsel includes investigation by counsel, Jones v. State, 491 S.W.2d 233 (Mo.1973), Jackson v. State, 465 S.W.2d 642 (Mo.1971), preparation by counsel, Brubaker v. Dickson, 310 F.2d 30 (9th Cir. 1962), and availability for conference, Coles v. Peyton, 389 F.2d 224 (4th Cir. 1968); and that the right applies to all critical stages in the proceedings against the accused, Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961).

Appellant's arguments are limited to and directed at "appointed counsel," and appellant's oral argument clarified that to mean Mr. Robert Babione of the St. Louis City Public Defender's Office who was the lawyer of record by appointment for this indigent defendant. No complaint is made of Mr. Hubel of the same office who was present at defendant's arraignment, of Mr. Noskay, Mr. Babione's superior, who was present at the guilty plea proceedings by entry of appearance, or of Mr. Vandover, defendant's trial attorney in St. Louis County, who was present at defendant's request and by entry of appearance at the guilty plea proceedings.

The evidence available to the trial court in resolving movant's charges and claims has been stated at length because it demonstrates that Robert Lee Walker had effective assistance of counsel at all stages of the proceedings against him and in all the areas suggested by his contentions.

On this record it is clear that Mr. Babione searched for witnesses, investigated the charge and its defenses, that he was aware of the status of defendant's psychiatric defense, that he was prepared to go to trial if necessary, and that he was coordinating the conduct of the case in his charge with Mr. Vandover who was in charge of the case in St. Louis County in which the psychiatric evidence and defense were being secured and presented. He had not conferred in person with defendant but he did demonstrate in his telephone conference that he was abreast of his client's situation and in a position to assist and advise. His absence from the arraignment lost nothing to defendant because his associate entered a not guilty plea under which no rights of defendant were waived. State v. Donnell, 430 S.W.2d 297 (Mo.1968). His absence from the plea proceedings lost nothing to defendant because his associate, Mr. Noskay, was present in his stead, and Mr. Vandover was present at defendant's request. Again, there is no complaint directed at their performance and the record demonstrates conclusively that Mr. Van-

dover had conferred with defendant at length, and fully advised and protected defendant in all respects. State v. Crider, 451 S.W.2d 825 (Mo.1970).

Judgment affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.